|  |  |  |
|---|---|---|
| MARK SWIFT, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 03974 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| DELIVERCARERX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Mark Swift and DeliverCareRx are in the pharmacy business. Swift sold his company to DeliverCare, which then engaged Swift as a consultant via a detailed written contract. Things did not go well. A few years into the relationship, DeliverCare let Swift go. Swift promptly sued, piling eight claims into his second amended complaint, which DeliverCare now moves to dismiss.[1] For the reasons discussed below, the motion will be granted, though all except two of the claims are dismissed without prejudice and can be re-pled.

## I. Background

In considering a motion to dismiss, the truth of the factual allegations must be assumed, and reasonable inferences are drawn in Swift's favor too. Ordinarily, facts outside the complaint cannot be considered, but here there are documents referred to by, and central to, the complaint's allegations, and those the Court may

---

[1]Subject-matter jurisdiction is proper over the federal claims under 28 U.S.C. § 1331 and the state-law claims under 28 U.S.C. § 1367. Citations to the record are "R." followed by the docket number and page or paragraph number.

consider. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (collecting cases).

## A. The Consulting Agreement

After DeliverCareRx, a private pharmacy, acquired a business from Mark Swift, the two entered into a consulting agreement. R. 62, Sec. Am. Compl. ¶¶ 5-6, 19. The deal obligated Swift to "render at least forty (40) hours of consulting services … per week." R. 62-1, Consulting Agr. § 1. What those services were is left unsaid, except that they would "be defined by [DeliverCare's] executive employees." *Id.* In return DeliverCare agreed to reward Swift handsomely, promising to:

- pay Swift $20,833 per month, *id*. § 1;

- reimburse him for various expenses, *id*.;

- grant him 184,900 shares of its common stock, Sec. Am. Compl. ¶ 9; R. 9-2, Capitalization of DeliverCare at 161; and

- grant him stock options amounting to, if exercised, another 2,062,409 shares, *id*.

The stock options were subject to several other agreements. One agreement, the "Notice of Grant of Stock Option," describes how they were to work. R. 9-2, Notice of Grant at 107. Of the 2,062,409 option shares, 25% would vest roughly a year into the consulting agreement, another 25% the year after that, another 25% the year after that, and the final quarter the year after that. *Id.* All this vesting was conditioned on Swift "continu[ing] to be engaged as a consultant" with DeliverCare on the vesting dates. *Id.*

In exchange for all this, Swift agreed to meet certain performance goals. These "Performance Expectations" were contained in "Schedule A" to the Consulting Agreement. R. 37-1 at 13, Sched. A. Schedule A describes three metrics: one for revenue, one for margins, and one for costs. *Id*. Swift agreed to produce, in just one year, a "Net addition of at least $25 million of organic net revenue." *Id*. § 1. And he agreed to make incremental progress on that goal every few months: $2,500,000 by month three; $8,000,000 by month six; $16,000,000 by month nine, and so on up to $25,000,000 by month twelve. *Id*. He also agreed to achieve a gross margin (basically revenue less costs divided by revenue) of at least 25%. *Id*. § 2. And finally, he agreed to keep the "Average Patient Enrollment Cost" to less than $100. *Id*. § 3.

After compensation and expectations, the agreement covered termination. DeliverCare could terminate Swift's services for cause or without cause. Consulting Agr. § 2(d). Not surprisingly, the type of termination made all the difference in whether Swift would receive an additional payout. If terminated without cause, Swift would be entitled to what the agreement called "Termination Payments": "If … [Swift's] engagement with [DeliverCare] is terminated by [DeliverCare] without Cause then [Swift] shall be entitled to receive his Consulting Fees" for a year after the contract is terminated. *Id*. § 2(b). But, if terminated for cause, then Swift "shall be entitled to receive his Consulting Fees only to the extent such amount has accrued through the Termination Date." *Id*. § 2(c). In other words, if fired for cause, Swift's pay ended with the end date. But if fired without cause, Swift would get paid for an extra year. "Cause" was defined to include noncompliance with Schedule A's

performance objectives: "For purposes of this Agreement, '<u>Cause</u>' means any failure to achieve any of the objectives, goals or metrics set forth on <u>Schedule A</u>." *Id.* § 2(e) (underlining in original).

Termination also affected Swift's stock options. The Notice of Grant provided that "if, at any time prior to [October 24, 2016, Swift] violates his Consulting Agreement" then "the Option and all Option Shares issued under the Option shall be forfeited, for no consideration, and canceled." Not. of Grant at 108. A separate agreement provided that if Swift were let go for cause, "as reasonably determined by the Plan Administrator, while this option is outstanding, then this option shall immediately terminate and be of no further force or effect." R. 9-2, Stock Option Agr. at 112-13. And a third agreement provided the same thing, but gave the Board the choice to keep the options alive even if Swift were terminated for cause. R. 9-2, 2012 Stock/Option Issuance Plan at 146-47.

## B. Swift's Performance

The Consulting Agreement became effective on October 24, 2012. Consulting Agr. at 1. Swift alleges that, from the beginning, DeliverCare made it impossible for him to meet the Schedule A objectives. According to Swift, DeliverCare:

- failed to begin service for new patients in a timely manner, Sec. Am. Compl. ¶ 35(a);

- failed to deliver "supplies necessary to service the volume of patients Swift was producing," *id.* ¶ 35(b);

- failed buy or build its own pharmacy until May 2013, disabling it from providing "prescriptions to its customers," *id.* ¶ 35(c);

- "failed to provide adequate staff to support the number of new patients Swift was required to produce," *id.* ¶ 35(d);

- provided "poor customer service," *id.* ¶ 35(e);

- "failed to train its employees adequately," *id.* ¶ 35(f);

- "failed to follow up on refill orders of medications," *id.* ¶ 35(g);

- "blocked Swift from using the company's computer and billing system," *id.* ¶ 35(h);

- "told all staff not to honor Swift's requests for information," *id.* ¶ 35(i);

- "insisted that all staff report directly" to President Steven Purdy, *id.* ¶ 35(j);

- eventually "changed all locks and codes preventing Swift from directly accessing the Offices or Pharmacy," *id.* ¶ 35(k);

Consistent with these allegations, Swift does not claim that he met, at any point, Schedule A's expectations.

Despite Swift's failure to deliver on Schedule A, DeliverCare kept Swift on, at least initially. Indeed, DeliverCare even invited Swift into the company bonus plan a little less than a year into the relationship. Steven Purdy (the company's president) wrote an email to Swift about a "newly derived 2013 Company Performance Plan." R. 40-1, 10/4/13 Email. Purdy wrote that the private equity group behind DeliverCare "asked me to include you in the [plan]," and informed Swift that "[t]his is not an individual bonus plan but meant to provide a company incentive." *Id.* The email asked Swift to "read the attached amendment to your consulting agreement." *Id.* Under the attached amendment, if DeliverCare finished the year with a certain amount of business, Swift was eligible for a $35,000 bonus. R. 40-1, Amendment 1. The amendment would not change the terms of the

consulting agreement, including the performance objectives: "[A]ny provision or Exhibit to this Agreement regarding minimum requirements and expectations for performance for [Swift] shall remain in full force and effect … ." *Id*.

Swift wrote back about two months later. R. 40-2, 11/27/13 Emails. Swift claimed he did not see the emailed amendment until just before he wrote back and he pointed out a timing issue. Purdy's "company incentive" plan was meant to incentivize hard work in 2013 by giving bonuses based on 2013 performance. But the plan was being proposed at the end of 2013—too late to provide the desired incentive. Swift wrote: "[W]ith less than 20 business days remaining in the year we are trying to develop a retroactive bonus plan [and that] does not make sense." *Id*. He also wrote that his attorney considered the plan "illegal," and suggested they take up the issue later. *Id*. Writing back, Purdy seemed to agree with scrapping the proposed amendment and discussing the issue later: "[I]t makes more sense to start 2014 with a plan for everyone that makes sense, is vetted for compliance and thus consider all 2013 plans voided and not applicable." *Id*.

### C. Termination

Just a few months after Purdy had invited Swift into the potential company bonus plan, the relationship soured. In February 2014, Swift told Purdy that the way DeliverCare was soliciting patients violated certain federal regulations. Sec. Am. Compl. ¶ 19. Then, on April 24, DeliverCare's lawyers sent Swift a letter giving him a choice between resignation and termination. R. 62-2, 4/24/14 Letter. It informed Swift that DeliverCare "is prepared to terminate your services for Cause

… stemming from you inability to achieve any of the objectives, goals or metrics set forth in Schedule A." *Id*. The letter spelled out the consequences: Swift's "consulting services and consulting fees and expenses would be immediately terminated," and his "stock options would be forfeited." *Id*. DeliverCare sent a final termination notice on May 21. Sec. Am. Compl. ¶ 14. Swift then sued. R. 1-1, Compl. After various amendments to the pleadings and after other motion practice, Deliver Care now moves to dismiss Swift's operative complaint. R. 39, 50.[2]

## II. Legal Standard

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Most claims fall under Rule 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (alteration in original) (internal quotation marks and citation omitted). And it must "contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at

---

[2]DeliverCare moved to dismiss the first amended complaint. R. 39. Then Swift sought, and was granted, leave to amend. R. 61. The second amended complaint made no changes to the claims in the first amended complaint but added two new ones. R. 63, 12/8/14 Hrg. at 15:25. So the Court construes the arguments in DeliverCare's first motion as targeting the claims in the second amended complaint that came, unamended, from the first amended complaint. *Id*. at 15:22-24. This made more sense than mooting the first motion only to have DeliverCare refile it. DeliverCare's second motion to dismiss, R. 55, targets only the two new claims.

570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Factual allegations, but not legal conclusions, are assumed to be true. *Iqbal*, 556 U.S. at 678-79.

## III. Analysis

DeliverCare moves to dismiss all eight counts in the second amended complaint. The Court considers each in turn.

### A. Count 1 – Breach of Contract

In this count, Swift alleges that DeliverCare breached the Consulting Agreement by failing to pay him Termination Payments and nixing his stock options. Sec. Am. Compl. ¶¶ 23-28. But the refusal to pay is only a breach if Swift was fired without cause.[3] As explained below, Swift has failed to plausibly allege that he was fired without, so this claim must be dismissed. But it will be dismissed without prejudice because Swift might be able to re-plead this claim into shape.

The complaint's fatal flaw is its failure to plausibly plead around Schedule A's performance requirements. Remember that Schedule A set out Swift's performance goals and that Swift's failure to meet those goals provided cause for his firing. Failure to meet those goals, Swift alleges, was DeliverCare's stated reason for terminating the contract. So to plausibly allege that he was fired without cause, Swift needs to allege that he met the Schedule A goals or that, somehow, his failure to do so was excused. He has done neither. Swift never alleges that he met the

---

[3]It is worth noting that, at some point, the issue of whether Swift was an employee will come up, at least as to the state-law claims. *See* 820 ILCS 115/1 ("This Act applies to all employers and employees … ."). The opinion is using the word "fire" here and elsewhere for convenience and brevity, not to hint, one way or the other, about whether Swift was an employee.

goals. Rather, Swift says that an email from DeliverCare's president excused him from complying with Schedule A.

But the email is just not susceptible to that interpretation, even giving Swift all reasonable inferences. Swift is relying on the email that says "consider all 2013 plans voided and not applicable." Yet the Consulting Agreement is not a "plan" and it is not from 2013 (it was signed and became effective in 2012). The email cannot reasonably be interpreted as talking about the Consulting Agreement, much less Schedule A. Context confirms this. The email exchange from which the "voided" language comes is about the companywide incentive plan, not Swift's individual Consulting Agreement. And the proposed incentive plan agreement attached to the emails says plainly that it was to have no impact on Schedule A. For all these reasons, it is too much of a stretch to think that the "voided and not applicable" email was talking about Schedule A.

In his opposition brief, Swift takes another jab at Schedule A—saying that his compliance with it was excused due to frustration. R. 47, Pl.'s Resp. Br. at 3-6. This punch misses too. The frustration doctrine does not apply, even on Swift's allegations, for at least two reasons. First, it requires that whatever frustrated the goals of the contract have been, at the time of contracting, not reasonably foreseeable. *Greenlee Foundries, Inc., v. Kussel*, 301 N.E.2d 106, 111 (Ill. App. Ct. 1973). The things that Swift argues frustrated his performance—the list in ¶ 35 of his complaint—were reasonably foreseeable. Poor business choices, bad customer

service, bad management, and inter-office strife are not so rare as to have been unforeseeable when Swift signed the deal.

Second, even if the doctrine applies, it could not help Swift. This is because the doctrine typically excuses all performance remaining under the contract—meaning that if a contract is frustrated, then *neither party* need go forward with its performance. *Smith v. Roberts*, 370 N.E.2d 271, 273 (Ill. App. Ct. 1977) ("the *parties* shall be excused") (emphasis added). So if Swift was right and the contract had been frustrated, then DeliverCare would not have to pay him and its failure to do so could not have been a breach.

There is, however, another contract-law principle suggested by the facts and by Swift that justifies permitting him a chance to amend the complaint. The principle is that a party to a contract can be said to waive a contractual requirement by the party's conduct. "Parties to a contract may waive provisions placed in the contract for their benefit; such waiver may be established by conduct indicating that strict compliance with contractual provisions will not be required." *Batterman v. Consumers Ill. Water Co.*, 634 N.E.2d 1235, 1236 (Ill. App. Ct. 1994). Swift should be given a chance to allege some conduct by DeliverCare "indicating that strict compliance with" Schedule A was not required. After all, DeliverCare knew he was not living up to Schedule A for almost two years before it fired him. Schedule A only covered about half that period. So it appears that DeliverCare kept Swift on for months and months after it knew that he had not met Schedule A's requirements. And, even though Swift did not meet the performance requirements, DeliverCare

thought he was doing well enough to invite him into the potential bonus plan (or so Swift alleges). This too suggests that Schedule A had fallen away. And there are other suggestions in the record, though not the current complaint, that also point in the direction of waiver. See R. 6-1, Swift Affidavit ¶¶ 18, 22, 25; R. 11, Mot. for Temp. Restr. Order ¶¶ 7-8 ("DeliverCare has waived [Schedule A.]"). This will be the final chance at amendment: this time, Swift must amend his complaint to make his best waiver allegations (if he can do so consistent with Rule 11's obligations) and must, if DeliverCare again moves to dismiss, actually argue the doctrine. This time around he failed to do either.

### B. Count 2 – Breach of Contract (Conditions Precedent)

This breach claim is the same as Count 1 except that Swift tries to rely on a conditions-precedent argument to get around Schedule A. Count 2 will be dismissed with prejudice for two reasons. First, conditions precedent must be pled with particularity under Rule 9 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 9(c) ("[W]hen denying that a condition precedent has occurred or been performed, a party must do so with particularity."). Here, Swift fails to point out where in the contract the alleged conditions precedent reside. And second, even though DeliverCare clearly made a Rule 9 argument (as well as other arguments targeting Count 2) in its motion, Swift failed to respond to them. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."). The conditions-precedent theory is insufficiently pled and, in view of the

lack of effort to state this claim in the current complaint and in the response brief, there is no good reason to give Swift another chance to save this claim.

### C. Count 3 – Illinois Wage Payment and Collection Act

Under the Illinois Wage Payment and Collection Act "[e]very employer shall pay the final compensation of separated employees in full." 820 ILCS 115/5. "[F]inal compensation" is "defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and *any other compensation owed the employee by the employer pursuant to an employment contract* or agreement between the 2 parties." 820 ILCS 115/2 (emphasis added). Swift alleges that the contractual Termination Payments are statutorily required "final compensation" because they are "other compensation owed to [Swift] by [DeliverCare] pursuant to [the Consulting Agreement]." Sec. Am. Compl. ¶¶ 47-54. So if, as Swift alleges, he was terminated without cause—and therefore entitled to Termination Payments—then DeliverCare violated the Act by failing to pay them out as final compensation.

This claim will be dismissed without prejudice. It must be dismissed for the same reasons that the breach of contract claim in Count 1 must be dismissed—Swift has not yet plausibly alleged his way around Schedule A and therefore not yet plausibly alleged an entitlement to Termination Payments. If he is not entitled to Termination Payments, then whether those payments qualify as final compensation under the Act is irrelevant. But, if Swift can allege waiver (as discussed earlier), then both the contract claim and this claim could become plausible.

DeliverCare has one additional argument, specific to this claim and the Act, but it is not persuasive. DeliverCare argues that the Termination Payments do not fit under the statutory definition of "final compensation" because the payments really should be categorized as unpaid future compensation. R. 40, Def.'s Br. at 6-8. In its corner, DeliverCare has *Majmudar v. House of Spices (India), Inc.*, 1 N.E.3d 1207 (Ill. App. Ct. 2013). There, the plaintiff signed a handwritten employment contract with the defendants. *Id.* at 1208-09. It was titled "5 year contract" and provided a "Base Salary" of $110,000 per year with unspecified annual bonuses and salary increases. *Id.* The plaintiff worked under the contract for about a year before being fired. *Id.* The case turned on whether unpaid future wages—the base salary from Year 2 through Year 5—qualify as final compensation: "The sole question on appeal [was] whether the Act applies to the remaining unpaid future wages." *Id.* at 1209. *Majmudar* said no: "[U]npaid future compensation for the remainder of a terminated contract where there is a question as to whether the employee was terminated for cause does not fall under the Act's definition of 'final compensation.'" *Id.* at 1216.

This does not help DeliverCare. As *Majmudar* itself recognizes, there is a difference between unpaid future wages and severance pay. *Id.* at 1215. Unpaid future wages, like the base salary in *Majmudar*, are the wages the employee would have received had the contract gone forward. Severance is different. It "is a payment that an employee is entitled to be paid upon separation from employment pursuant to an agreement between the parties or established practice of the

employer." 56 Ill. Admin. Code § 300.530. In other words, a severance payment is one that the contract obligates the employer to make on termination, not—as with wages—based on hours or weeks or other units of work.

Under the Act, "final compensation" includes severance but excludes, at least as interpreted by *Majmudar*, unpaid future wages. This makes sense. The primary reason that *Majmudar* held that unpaid wages are not final compensation is that the word "compensation" and the other words used to define final compensation connote an exchange—that the employee did something to earn the payment. *Majmudar*, 1 N.E.3d at 1211-12. An employee has not yet earned unpaid future wages, because the employee (having been terminated) has not performed the work for the future wages. Severance payments are different. A severance payment is a bargained-for benefit of termination, earned by signing the contract and agreeing to forgo other opportunities. Another way of looking at it is to say that an employee earns a severance payment by performing a non-compete clause, which would obligate the separated employee to stay out of competition with the former employer for a year or two. (Swift agreed not to compete with DeliverCare for two years after separation. Consulting Agreement § 5(b).)

Illinois courts recognize these principles. *Elsener v. Brown* implicitly held that severance is final compensation—the point being necessary to its holding on vicarious liability. 996 N.E.2d 84, 100-04 (Ill. App. Ct. 2013). Recognizing this, *Majmudar* distinguished *Elsener* based on the unpaid-wages versus severance distinction. *Majmudar*, 1 N.E.3d at 1215 ("[I]n contrast to the present case, the

plaintiff's contract in *Elsener* also provided that the plaintiff would be entitled to a severance."). There was nothing in the brief, handwritten *Majmudar* contract about severance. But Swift's Consulting Agreement provided for Termination Payments, which fit the definition of severance. That the Termination Payments are defined— that is calculated—by reference to unpaid future wages is irrelevant. Swift is not asking for his salary as salary itself, he is asking for a payment that DeliverCare became obligated to pay when it terminated Swift. That is a severance payment; it just so happens that the severance amount is calculated by referring to his salary. The Termination Payments do count as final compensation under the Act. So if Swift can fix the complaint to plead a claim of termination without cause, then this claim can also be fixed.

### D. Count 4 – Illinois Wage Payment and Collection Act (Conditions Precedent)

This claim relies on the already rejected conditions-precedent-based breach claim. Because that particular breach claim was dismissed with prejudice, this claim will be too.

### E. Count 5 – Conversion of Stock Options

Swift claims that by cancelling his vested stock options when it fired him, DeliverCare converted them. Sec. Am. Compl. ¶ 59. Like the contract and state-law statutory claims, this claim too will be dismissed without prejudice. It too depends on Swift alleging that he was fired without cause—if fired for cause, then the options would have been forfeit. Notice of Grant at 107-08. If forfeit, Swift would have had no right to the options. And because a right to the converted property is

15

an element of conversion, the claim would fail. *G.M. Sign, Inc. v. Elm Street Chiropractic, Ltd.*, 871 F. Supp. 2d 763, 767 (N.D. Ill. 2012) (elements of conversion). So this claim too depends on Swift alleging that DeliverCare waived Schedule A.

DeliverCare's other arguments on this claim—those that do not depend on Schedule A—do not convince the Court to dismiss this claim with prejudice. First, DeliverCare says that Swift should have attempted to exercise the options within three months of his termination, which is the date on which they would have expired if Swift had been terminated without cause. Def.'s Br. at 8-13. This argument is a stranger to any relevant law.

Instead of discussing relevant Illinois law, DeliverCare relies on a New York case about calculating conversion damages. *Lucente v. Int'l Business Machines Corp.* addressed an options deadline only because the court there needed an exercise date in order to calculate, in one particular way, damages. 146 F. Supp. 2d 298, 312 (S.D.N.Y. 2001), *rev'd on other grounds*, 310 F.3d 243 (2d Cir. 2002). The date of exercise mattered because the option price in that contract was set by the contract, whereas the market price of the stock of course changes. So damages—the value of the lost option—depended on timing. That was all there was to *Lucente*. All of DeliverCare's arguments based on it have nothing to do with whether Swift did or can plead a plausible conversion claim. Put simply: that one must exercise an option to calculate one's damages in a particular way does not mean that one must attempt to exercise an option in order for the option to have been wrongfully converted.

DeliverCare also argues that Swift's claim fails because he failed to—after being fired—demand his options back. In Illinois, "[t]he elements of a conversion claim are: (1) defendants' unauthorized and wrongful assumption of control, dominion, or ownership of the plaintiff's personal property; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property." *Medscript Pharm., LLC v. My Script, LLC*, 2015 WL 149062, at *8 (N.D. Ill. Jan. 12, 2015) (citations and quotations omitted). True, Swift did not allege that he demanded the right to exercise his options after he was fired. But even if he cannot allege a demand, he almost certainly can plausibly allege that a demand would have been futile by alleging the contents of the letter firing him, which told Swift flat-out that the options were gone. Because futility can excuse the lack of a demand, *Runnemede Owners, Inc. v. Crest Mortg. Corp.,* 861 F.2d 1053, 1060 (7th Cir.1988) (applying Illinois law), this argument fails. See *Inchingolo v. Ab Initio Software*, 2006 WL 3196842, at *6 (S.D. Ill. Nov. 3, 2006) (citing *Runnemede*) ("[P]laintiff must demonstrate that he demanded return of the property or present objective facts proving futility of such a request.").

### F. Count 6 – Declaratory Judgment Act

Swift appears to claim that the portion of his Consulting Agreement that takes away his stock options—vested and future—in the event of termination for cause is, under Illinois law, an unenforceable penalty clause. Sec. Am. Compl. ¶ 62. In his response brief, he argues only about his vested options. Pl.'s Resp. Br. at 9

(referring to a "$400,000 penalty," which corresponds to Swift's valuation of only the vested options, Sec. Am. Compl. ¶ 59). Whatever the true scope of this claim, it will be dismissed without prejudice.

First, there is nothing in the Consulting Agreement itself that takes away Swift's options. So Swift's claim fails because it relies on contract language that is not there. There is language in another contract, Notice of Grant at 107, but Swift did not mention that contract in the claim or attach it to his complaint. So, as pled, the claim fails. Second, the claim fails because Swift did not make a necessary allegation, though this one is readily reparable. Swift is saying that the forfeiture provision is a penalty, one that is triggered by Swift performing so poorly that DeliverCare had cause to terminate the Consulting Agreement. Really, then, this claim is an *alternative* to his other claims on the stock options. The other claims are premised on DeliverCare *not* having cause to terminate the consultancy, and thus there was no contractual trigger to take away the options. In contrast, this penalty claim is that even if DeliverCare did have cause to terminate the consultancy, the enforcement of the options-forfeiture clause is invalid because the clause is an unenforceable penalty. So if Swift repleads this claim, he must take into account its alternative nature.

## G. Count 7 –False Claims Act - Retaliation

The False Claims Act prohibits retaliation against employees who attempt to further the Act's purposes: "[a]ny employee … shall be entitled to all relief necessary to make that employee … whole, if that employee … is discharged, …

because of lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). Swift claims DeliverCare violated this provision by firing him after he investigated and complained that DeliverCare was violating federal regulations that prohibit direct solicitation of certain patients. Sec. Am. Compl. ¶¶ 64-70. Swift has failed to plausibly plead and defend this claim. It will be dismissed (though without prejudice) for two reasons.

The first is that Swift has not explained, and his allegations do not themselves reveal, how what Swift did amounts to the kind of conduct protected from retaliation by the Act. The Act only prohibits the firing of those employees who take steps "in furtherance of a[ legal] action," or who make "other efforts to stop 1 or more violations of the" Act, which, generally speaking, prohibits fraud against the government. Swift does not appear to rely on the "in furtherance" route, so he must explain how, by soliciting prospective patients in violation of federal regulations, DeliverCare was committing fraud against the government. He has not done so. And the answer is not obvious.

Swift might be able to allege that (a) DeliverCare, if it seeks payment from the government at all, certifies that DeliverCare, in compliance with federal regulations, does not directly solicit prospective patients and that (b) if the government knew this certification were false, it would not pay DeliverCare. This theory might state a claim. *See U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014) (discussing false certification theory of

False Claims Act liability) (citing *United States v. Rogan*, 517 F.3d 449, 451 (7th Cir. 2008); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732 (7th Cir. 1999)). But he must make the allegations—and if another motion to dismiss is filed, the arguments—necessary to support this theory.

In addition to identifying a plausible theory of protected activity, Swift must also shore up his allegations connecting his activity to his firing. Swift must plausibly allege that DeliverCare fired him "because of" the protected activity. 31 U.S.C. § 3730(h). So far, Swift has alleged that around a year or so into his consulting relationship with DeliverCare, he told DeliverCare President Steven Purdy that directly soliciting prospective patients violated federal law. Sec. Am. Compl. ¶ 19. He then alleges that he spent some time investigating—he does not say how—and that he was then fired three months later. *Id.* ¶ 20. That is not enough. All we know is that Swift complained to Purdy. Without knowing also that Purdy made the decision to fire Swift, or told whoever did make that decision about Swift's complaints, there is no plausible connection between Swift's actions and the termination. Temporal proximity between Swift's activities and the firing is not enough where, as here, there was already trouble between Swift and DeliverCare long before Swift claims to have made his report to Purdy. *Id.* ¶ 35 (describing problems in the year before Swift reported).

In light of the possibility of another amended complaint, it is worth discussing one of DeliverCare's arguments in particular. DeliverCare insists that the regulations against direct solicitation do not apply to it, and for this reason,

Swift must lose. True, Swift must have "undertake[n] the protected conduct with the actual and reasonable belief that the employer is committing fraud against the government." *Momence*, 764 F.3d at 715 (internal quotation marks omitted). DeliverCare argues that Swift's belief, if it existed at all, could not have been reasonable because it would not be reasonable for him to think that the solicitation regulations apply to DeliverCare. Def.'s Br. at 6-7. But it is possible that Swift could amend the complaint to plausibly allege that Swift reasonably believed that the regulations do apply to DeliverCare (Swift must be sure to add the necessary allegations if and when he re-pleads).

The premise of the reasonable belief is as follows: the regulation that appears to prohibit what the parties call "direct solicitation" is 42 C.F.R. § 424.57(c)(11). (There are other regulations and a statute that contain the same prohibition and might also apply, but one is enough.) That lengthy regulation appears to prohibit the direct solicitation of patients by entities that apply to the Centers for Medicare & Medicaid Services, called CMS, to become "DMEPOS suppliers." "DMEPOS stands for durable medical equipment, prosthetics, orthotics and supplies" and a DMEPOS supplier is "an entity or individual, including a physician or a Part A provider, which sells or rents Part B covered items to Medicare beneficiaries … ." 42 C.F.R. § 424.57 (definitions).

Under the regulation, "supplier[s] must meet and must certify in [their] application[s] for billing privileges that [they] meet[] and will continue to meet" a long list of standards. *Id.* § 424.57(c)(1). Those standards include that the supplier

"[m]ust agree not to contact a beneficiary by telephone when supplying [ ] Medicare-covered item[s] unless" the beneficiary (that is, the prospective pharmacy patient) has given the supplier written permission or has already done business with the patient. *Id.* § 424.57(c)(11). This interpretation of the regulation is bolstered by a corresponding portion of the Federal Register, which provides that "DMEPOS suppliers are prohibited from making unsolicited telephone contacts to Medicare beneficiaries." 64 Fed. Reg. 36380 & n.129 (citing 42 U.S.C. § 1395m(a)(17) which repeats the same prohibition as the regulation).

So the regulation appears to prohibit what Swift says it does and the question thus becomes whether Swift could reasonably believe that it applies to DeliverCare. Since DeliverCare appears to have applied to CMS for DMEPOS billing privileges, Swift can. Swift submitted with his opposition brief a letter to DeliverCare from Palmetto GBA, a "CMS Medicare Administrative Contractor," approving DeliverCare's "application for billing privileges" as a "supplier of Durable Medical Equipment, Orthotics, Prosthetics, and Supplies (DMEPOS)." R. 57-2, 9/17/13 Letter at 1. The letter suggests that DeliverCare applied for DMEPOS billing privileges and thereby subjected itself to the regulation prohibiting direct solicitation. Accordingly, Swift might well be able to plead that he reasonably believed that DeliverCare was prohibited from directly soliciting patients and—if he can explain how, by doing so, DeliverCare was defrauding the government—plausibly plead that his investigation and reporting were "other efforts" protected

from retaliation by the Act. That—added to better allegations of causation—would go a long way toward making this claim plausible.

### H. Count 8 – Illinois Whistleblower Act - Retaliatory Discharge

Based on the same underlying allegations, Swift also pleads a retaliation claim under state law. Sec. Am. Compl. ¶¶ 71-74. Against this claim, DeliverCare makes two arguments. The first is that Swift failed to allege that "DeliverCare violated a 'State or federal law, rule or regulation,'" as the state law requires, because Swift only alleged that DeliverCare violated the solicitation regulation and that regulation does not apply to it. R. 56, Def.'s Br. at 13. This argument justifies dismissing the claim, though again without prejudice. Although the analysis above makes clear that Swift deserves a chance to buttress his allegations tying DeliverCare to the regulation, his current complaint and briefing are inadequate, as described above. DeliverCare's next argument—a single sentence—is too underdeveloped to be considered. *United Auto. Ins. Co. v. Veluchamy*, 747 F. Supp. 2d 1021, 1030 (N.D. Ill. 2010) ("[T]he skeletal presentation on that issue … constitutes a further waiver of the point."). DeliverCare says that "because the SAC contains factual inconsistencies as to why Swift was terminated, Swift has failed to plead a plausible claim for wrongful discharge." Def.'s Br. at 13. DeliverCare fails to explain why those factual inconsistencies doom Swift, or why they even matter given that Rule 8(d)(3) of the Federal Rules of Civil Procedure specifically allows inconsistent pleading. This argument is rejected.

# I. Dismissal as Penalty for Breach of § 3730(b)(2) Seal

When an individual files a qui tam case under the False Claims Act, that case must be filed under seal. 31 U.S.C. § 3730(b)(2). The seal gives the government the opportunity to investigate the case and decide whether to take it over from the filer. *Id.* The seal is important and at least a few courts have dismissed qui tam claims filed by individuals who neglect to file under seal. *See, e.g., Khan v. Chicago Hous. Auth.*, 2002 WL 849801, at *3 (N.D. Ill. May 3, 2002). Here, Swift has occasionally referred to the qui tam case he filed in this District, which is currently proceeding and under seal. Based on those disclosures, DeliverCare—in a footnote—has asked this Court to dismiss Swift's retaliation claim in this case. Def.'s Br. at 12, n.7.

But footnote arguments are often deemed waived. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013). This one will be because DeliverCare presents what is actually a very complex question, undecided in this Circuit, in a single sentence and a string cite. And even if not waived, the argument would be rejected. None of DeliverCare's cases is like this one. This case involves a retaliation claim in one lawsuit filed by a plaintiff who, although technically complying with § 3730(b)(2)'s requirements in a separately filed qui tam suit, publicly mentioned the qui tam suit. None of DeliverCare's cases share those circumstances. Most just dismiss qui tam claims where the plaintiff failed to file under seal. *U.S. ex rel. Summers v. LHC Grp., Inc.*, 623 F.3d 287, 299 (6th Cir. 2010); *U.S. ex rel. Le Blanc v. ITT Indus., Inc.*, 492 F. Supp. 2d 303, 308 (S.D.N.Y. 2007). Two of the cited cases actually hurt DeliverCare's position because, although they dismiss the qui tam

claim as a sanction for disclosure, they nonetheless decide parallel retaliation claims, like the one here, on their merits. *U.S. ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 1000 (2d Cir. 1995) ("On the other hand, we perceive no basis to disturb the district court's ruling that James Pilon's claim for retaliatory discharge should be dismissed without prejudice. Section 3730(h) retaliation claims, unlike § 3730(b) qui tam claims, are not subject to the procedural requirements of § 3730(b)(2)"); *Khan*, 2002 WL 849801 at *2. This suggests that, whatever the penalty for disclosure is, it will run against the qui tam claim, but not the related retaliation claim.

## J. The Motion to Stay

DeliverCare has moved to stay this case to allow the parallel qui tam case to proceed without interference. DeliverCare is concerned that litigating the retaliation claim in this case will involve duplicative discovery and further compromise the already breached seal in the other case. For now, that motion is denied. Because all of Swift's claims are being dismissed, the extent of any interference cannot now be determined. It may be that Swift abandons his retaliation claim or, after re-pleading it, loses it with prejudice after another motion to dismiss. In either case allowing this litigation to proceed would not interfere, or at least not interfere much, with the qui tam case. The stay issue can be litigated after the pleadings are settled.

## K. The Motion to Strike

Swift moved to strike DeliverCare's citations to prior litigation involving, and not flattering to, Swift. The motion is denied as moot. Those cases had no bearing on the Court's decision on this motion. The Court focused on the allegations in this case. DeliverCare should too.

## IV. Conclusion

DeliverCare's motion to dismiss is granted. Counts 2 and 4 are dismissed with prejudice. Counts 1, 3, 5, 6, 7, and 8 are dismissed without prejudice and with leave to amend. If Swift wishes to proceed with the case, then he must file a third amended complaint by July 14, 2015.

ENTERED:


_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: June 23, 2015